# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **JOSEPH DAVID WEIS, III, ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 15-488-JJB-RLB** |
| **DSM COPOLYMER, INC., ET AL.** | |

## <u>NOTICE</u>

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have fourteen (14) days after being served with the attached Report to file written objections to the proposed findings of fact, conclusions of law and recommendations therein. Failure to file written objections to the proposed findings, conclusions, and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge which have been accepted by the District Court.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Signed in Baton Rouge, Louisiana, on November 23, 2015.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

JOSEPH DAVID WEIS, III, ET AL.                          CIVIL ACTION

VERSUS                                                  NO. 15-488-JJB-RLB

DSM COPOLYMER INC., ET AL.

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the court on Plaintiffs' Motion to Remand. (R. Doc. 9).  The Motion
is opposed. (R. Doc. 24).  Plaintiffs have filed a Reply. (R. Doc. 41).  The court held oral
argument on November 10, 2015.  For the following reasons, Plaintiffs' Motion to Remand
should be **GRANTED**, and the action should be **REMANDED** to the 19th Judicial District
Court, East Baton Rouge Parish, Louisiana.

I.      **Background and Procedural History**

        A.      **The Petition**

        On July 2, 2015, Joseph David Weis III, Karen Weis Nation, David Arthut Weis, David
Joseph Weis, Alexandre Bayma Weis and Thereza Bayma Weis (collectively, "Plaintiffs") filed
this action in the 19th Judicial District Court, East Baton Rouge Parish, Louisiana. (R. Doc. 1-1,
"Petition").  Plaintiffs allege that the Joseph Weis ("Decedent") was diagnosed with asbestos-
related Mesothelioma and died as a consequence of this disease on July 24, 2014.  (Petition, ¶
18).  Plaintiffs are Decedent's surviving spouse and children, and they bring this action under
Louisiana state law against various entities that allegedly exposed Decedent to asbestos during
the course of his employment with the removing defendant, DSM Copolymer, Inc. ("DSM")[1]

---

[1] Plaintiffs refer to DSM as "Copolymer" in their filings based on its original name "Copolymer
Corporation."

from the years 1956-1966 as a maintenance worker at DSM's facility in Baton Rouge, Louisiana (the "Facility").[2] (Petition, Ex. A).[3]  Plaintiffs seek recovery for physical pain and suffering, physical impairment, disfigurement, reasonable and necessary medical expenses, reasonable funeral and burial expenses, loss of earnings, and mental anguish. (Petition, ¶ 64).

Plaintiffs bring causes of action for negligence (Count Five); intentional tort (Count Six), and premises liability (Count Seven) against DSM. (Petition, ¶¶ 47-58, Exs. D-E).  In Count Five, Plaintiffs allege that DSM and its executive officers and directors were negligent, grossly negligent, and wanton in its misconduct by "failing to provide and/or ensure a safe workplace for their employees, free of hazardous concentrations of asbestos and asbestos-containing dust." (Petition, ¶ 47).  Plaintiffs specifically allege that DSM and its executive officers and directors proximately caused Decedent's asbestos-related injuries, illnesses, and disabilities by (a) failing to provide adequate safety equipment; (b) failing to protect Decedent from any asbestos exposure; (c) failing to provide Decedent sufficient personal protective equipment, safety devices and work procedures intended to prevent the effects of asbestos exposure; (d) failing to supervise compliance with safety guidelines; (e) failing to use or misusing equipment within their control which were intended to minimize exposure to asbestos dust; (f) failing to properly perform safety inspections; (g) failing to properly perform maintenance of asbestos; (h) failing to comply with applicable State and federal regulations regarding workplace exposure to asbestos; (i) failing to properly perform or direct the removal and abatement of asbestos in place at Decedent's work

---

[2] As explained below, the Facility originally consisted of two distinct plants known as Plancor 152, which produced butadiene, and Plancor 876, which produced synthetic rubber.
[3] The remaining defendants are Anco Insulations, Inc.; Liberty Mutual Insurance Company; Owens-Illinois, Inc.; Reilly-Benton Company, Inc.; Riley Power, Inc.; Arrowood Indemnity Company; Taylor-Seidenbach, Inc.; The McCarthy Corporation; The Travelers Insurance Company; and Union Carbide Corporation. (Petition, Ex. B).

sites; and (j) negligently failing to disclose, warn or reveal medical and safety information to Decedent regarding the hazards of asbestos. (Petition, ¶ 51).

In Count Six, Plaintiffs allege that the acts and omissions of DSM and its executive officers and directors amount to "intentional, willful and wanton failure to disclose to Decedent the dangers associated with exposure to asbestos, the risks associated with working in an atmosphere contaminated with asbestos and the likely medical effects of such exposure." (Petition, ¶ 53).  Plaintiffs allege that, among other things, DSM intentionally failed to provide necessary protection, safety equipment, monitoring devices, and warnings to Decedent. (Petition, ¶ 55).

In Count Seven, Plaintiffs allege that Decedent's occupational exposure to asbestos and asbestos-containing materials occurred at the Facility. (Petition, ¶ 57, Ex. A).  Plaintiffs allege the following in support of this claim:

(1) "Decedent was exposed to asbestos and asbestos-containing materials while working" at the Facility;

(2) DSM was, at all relevant times, the operator, manager, owner, and/or occupier of the Facility and in custody of the Facility;

(3) The Facility was "defective in that the asbestos and asbestos-containing materials" in the Facility "created an unreasonable risk of harm to Decedent and other persons on the premises";

(4) The "defective condition of the facilities was a proximate cause of Decedent's asbestos-related injuries and damages";

(5) DSM failed to exercise reasonable care to protect Decedent from the foreseeable damages associated with exposure to asbestos;

(6) DSM "had a non-delegable duty to keep the premises safe for invitees";

(7) DSM "knew or should have known of the unreasonable risk of harm inherent in exposure to asbestos and asbestos-containing materials but failed to protect Decedent from said risk of harm";

3

(7) DSM's "failure to protect Decedent from known and/or foreseeable damages constitutes negligence"; and

(8) "Said negligence was a proximate cause of Decedent asbestos-related injuries and damages."

(Petition, ¶¶ 57-58).

**B.      The Notice of Removal and Motion to Remand**

On July 24, 2015, DSM removed this action on the basis of the federal officer removal statute, 28 U.S.C. § 1442(a). (R. Doc. 1).  In the Notice of Removal, DSM asserts that this "suit involves a controversy concerning acts undertaken by a federal officer or someone acting under him, and involves a property holder whose title is derived from such United States officers." (R. Doc. 1 at 2).  DSM further asserts that Decedent was an employee of the Facility "from 1956 to 1966" and that "[d]uring the majority of the period of alleged exposure to asbestos, DSM operated under the control and supervision of federal officers of the United States acting under color of such office." (R. Doc. 1 at 2-3).

DSM provides a brief history of the Facility.  DSM asserts that the "design and construction of the plant was accomplished under the auspices of the Defense Plant Corporation, an instrumentality of the United States Government created on August 22, 1940 under Section 5(d) of the Reconstruction Finance Corporation Act (Public Law 2, 72nd Congress, 47 Stat. 5) by the Reconstruction Finance Corporation, itself an instrumentality of the United States Government created on January 22, 1932 under the same act." (R. Doc. 1 at 3-4).  DSM further asserts that the Facility "was originally two distinct plants built by the Defense Plant Corporation: a butadiene plant known as Plancor 152, and a synthetic rubber plant known as Plancor 876." (R. Doc. 1 at 4).  DSM claims that both of these plants "were designed to criteria established by a federal officer of the United States or an agency thereof, or persons acting under

4

him, and were built under the supervision of a federal officer of the United States . . . ." (R. Doc. 1 at 4).

DSM asserts that after it was incorporated in 1942 as "Copolymer Corporation," it operated Plancor 876 "under the direction of and according to the specifications of a federal officer . . . ." (R. Doc. 1 at 4).  DSM asserts that it operated the government-owned facilities until April 22, 1955, when it "purchased Plancor 152 and Plancor 876 from the Rubber Producing Facilities Disposal Commission; an instrumentality of the United States Government created under the Rubber Producing Facilities Disposal Act of 1953 (Public Law 205, 83rd Congress, 67 Stat. 408)." (R. Doc. 1 at 4).  DSM further provides that even after it purchased Plancor 152 and Plancor 876, it remained under the "authority and control" of a federal officer until 1965 because the sale was "conditioned on compliance with the Rubber Producing Facilities Disposal Act of 1953 and the National Security Clause, which required DSM to maintain the plant and to submit to government officer oversight for a ten-year period following the purchase, and which gave the government the unconditional right to possession and use of the plant during that ten-year period." (R. Doc. 1 at 5).

In support of removal, DSM relies on decisions by this court allowing it to remove prior exposure actions involving the Facility pursuant to the federal officer removal statute. *See Lalonde v. Delta Field Erection, et al.*, No. 96-3244, 1998 WL 34301466 (M.D. La Aug. 5, 1998); *Catania*, *et al. v. ACandS, Inc.*, *et al.*, No. 02-368 (M.D. La. June 14, 2002), *report and recommendation adopted*, (M.D. La July 18, 2002).

Finally, DSM provides in the Notice of Removal that it plans on asserting the government contractor defense, certain defenses and immunities available under the Defense

Protection Act of 1950, 50 U.S.C. § 2061, *et seq.*, and "any other federal act relating to the design, construction, and operation, and/or maintenance of DSM's premises." (R. Doc. 1 at 5).

On August 4, 2015, DSM filed an Amended Notice of Removal solely to list all defendants in the caption. (R. Doc. 6).

On August 24, 2015, Plaintiffs filed the instant Motion to Remand arguing that DSM's removal of the action was improper under either 28 U.S.C. § 1442(a)(1) or 28 U.S.C. § 1442(a)(2). (R. Doc. 9).

## II.     Arguments of the Parties

### A.     Plaintiffs' Motion to Remand

In support of remand, Plaintiffs argue that DSM fails to meet its burden of proving all three elements as required under 28 U.S.C. § 1442(a)(1), namely that "(i) it was acting 'under color' of the 'office' of the United States Government; (ii) there was a nexus between those actions and the harm alleged by Plaintiffs in this case; and (iii) it had a colorable federal defense." (R. Doc. 9-1 at 1).

First, Plaintiffs argue that DSM was not acting under the direction of a federal officer while Decedent worked at the Facility. (R. Doc. 9-1 at 7-8, 15-17).  Plaintiffs argue that that unlike the claims in the court's prior *Lalonde* or *Catania* decisions, Plaintiffs provide evidence that Decedent only worked at the Facility from October 29, 1956 through April 11, 1966, while it was owned by DSM, not the federal government. (R. Doc. 9-1 at 7-8); (R. Doc. 9-6).  Plaintiffs provide the relevant Act of Sale for Plancor 152 (butadiene plant) (R. Doc. 9-4) and Act of Sale for Plancor 876 (synthetic rubber plant) (R. Doc. 9-5) to demonstrate that DSM purchased the facilities from the federal government in April of 1955. (R. Doc. 9-1 at 11).  Plaintiffs argue that pursuant to these sale documents, DSM was charged with maintaining the facilities "free from

waste or nuisance of any kind, and in good repair, working order and condition" and with making "all needful and proper repairs thereto and renewals and replacements therefore." (R. Doc. 9-1 at 15-16); (R. Doc. 9- 4 at 18); (R. Doc. 9-5 at 24-25). Plaintiffs argue that the "National Security Clause" placed in the sale contracts did not constitute "detailed control" or "strong government intervention" as they only required that DSM "maintain the facilities in a manner such that it could (if asked) produce butadiene and rubber" for the federal government if needed. (R. Doc. 9-1 at 16); (R. Doc. 9-4 at 12-13); (R. Doc. 9-5 at 15-16). Plaintiffs submit an affidavit of Spellman Decoteau, an co-employee of Decedent who worked at the Facility from 1951 to 1958, which states that while Decedent worked at the Facility, no federal government representative "ever conducted or attended a safety meeting," gave work instructions, or told the employees what equipment to use. (R. Doc. 9-8, "Decoteau Affidavit").

Second, Plaintiffs argue that there is no causal nexus between the federal government's actions and the Plaintiffs' allegations of harm. Plaintiffs highlight that they have not specifically alleged a claim for "strict liability" against DSM and that there is no evidence in the record that the federal government required DSM to "not warn about the hazards of asbestos" or "to use the asbestos in a manner that allowed the asbestos particles to be released in the breathing zone of other workers." (R. Doc. 9-1 at 9-10, 17-21). Plaintiffs further argue that DSM's mere "possession" or "use" of asbestos at the Facility cannot absolve them of liability for negligence and premises liability. (R. Doc. 9-1 at 10, 18-20). Plaintiffs argue that the majority of DSM's authority and evidence apply only to the pre-1955 time period in which DSM was government-owned, and in which Decedent was not an employee. (R. Doc. 41 at 2, 4, 6-7). Plaintiffs further argue that DSM's post-1955 evidence demonstrates that the brief inspections conducted by the federal government did not mention asbestos and that the federal government gave no directions

regarding the issuance of warnings and/or the manner of use of asbestos. (R. Doc. 41 at 2-6, 8-10).

Third, Plaintiffs argue that DSM does not demonstrate that it has a colorable federal defense in this action pursuant to the federal contractor defense or the Defense Production Act. (R. Doc. 9-1 at 10-11, 21-23).  DSM argues that DSM has not articulated why its asserted federal defenses are "colorable" in light of the parties and claims in this action. (R. Doc. 41 at 10).

Finally, Plaintiffs argue that DSM fails to meet its burden of proving removal pursuant to 28 U.S.C. § 1442(a)(2) because even if DSM acquired title of the Facility from the federal government, the action "does not affect or challenge the validity of any law of the United States." (R. Doc. 9-1 at 23).

**B.      DSM's Opposition to Remand**

DSM argues that it acted under the direction of a federal officer and there is a causal nexus between that direction and Plaintiffs' claims.   DSM asserts that when Plancor 152 and Plancor 876 were government owned, they were "designed to technical specifications" established by the federal government; they "were built under the direct supervision of federal officers"; and their "original plans and specifications," which were prepared by the federal government, "required the use of the asbestos-containing insulation products." (R. Doc. 24 at 5).[4] DSM further asserts that while it owned the Facility, the federal government "controlled production specifications, manufacturing requirements, operating procedures, testing procedures, safety requirements, and safety meetings" at the Facility. (R. Doc. 24 at 5). In support of these

---

[4] In support of these contentions, DSM cites Executive Order No. 10678, 21 FR 7199 (Sept. 20, 1956) ("Administration of the Functions of the Rubber Producing Facilities Disposal Commission").  President Eisenhower's executive order, which was issued a decade after the DSM facilities were already in operation, makes no mention of any "technical specifications" established by the federal government for the facilities' designs, much less any "original plans and specifications" requiring the use of asbestos-containing insulation products.

contentions, DSM submits the November 27, 1996 affidavit of Arley Ray Baker (a federal employee from 1950-1952) (R. Doc. 24-4, "Baker Affidavit"); and the December 2, 1996, affidavit Martin E. Samuels (a DSM employee from 1943-1982) (R. Doc. 24-5; "Samuels Affidavit").

DSM argues that the federal government maintained a "high level" of control over the facilities after they were sold to DSM pursuant to the Rubber Producing Facilities Disposal Act of 1953, which required the National Security Clause in the sale contracts pursuant to 50 App. U.S.C. § 1941e(h). (R. Doc. 24 at 7).  DSM notes that in 1956, pursuant to Executive Order 10678, President Eisenhower directed the Federal Facilities Corporation to be in charge of sale contracts made pursuant to the Rubber Producing Facilities Disposal Act and gave the Federal Facilities Corporation the authority and duty to oversee and administer the National Security Clauses. (R. Doc. 24 at 7-8).  DSM further notes that these duties were inherited by the Utilization and Disposal Service division of the General Services Administration from September 1961 through 1965 after the Federal Facilities Corporation was dissolved. (R. Doc. 24 at 11).  DSM provides documents indicating that the Facility was inspected "at least nine times from February 1956 through June 1964" for the purpose of determining that DSM was complying with the terms of the National Security Clauses. (R. Doc. 24 at 11-12); (R. Doc. 24-10).  DSM submits the September 3, 1999 affidavit of Robert R. Dennis, Jr. (a DSM employee from 1952-1988) (R. Doc. 24-6, "Dennis Affidavit) in support of the contention that the continued use of asbestos-containing insulation was necessary during the 1950s and 1960s to maintain the readiness required pursuant to the National Security Clauses.[5]

---

[5] At oral argument, defense counsel argued that the Dennis Affidavit supported the proposition that the original government plans for the Facility required the use of asbestos-containing insulation products.

In light of the foregoing, DSM argues that "government oversight and control of DSM did not end until April, 1965" for the purpose of establishing the "acting under a federal officer" and "causal nexus" elements under 28 U.S.C. § 1442(a)(1). (R. Doc. 24 at 9-17).  DSM further asserts that the *Lalonde* and *Catania* decisions should be followed, focusing on the historical underpinnings of the rubber plant industry in relation to U.S. war efforts as described in *Lalonde*. (R. Doc. 24 at 2-3, 17).

Finally, DSM argues that it has pled a colorable federal defense, stating that it "has presented ample facts which demonstrate that the government contractor's defense, the Defense Production Act, or some variation of these two defenses may apply in light of the unique relationship that existed between DSM and the Government from 1942 through 1965." (R. Doc. 24 at 19).

DSM provides no arguments in support of removal pursuant to 28 U.S.C. § 1442(a)(2).

**C.      The *Bartel* Decision**

On October 19, 2015, Plaintiff filed a Notice of New Authority arguing that the Fifth Circuit's decision *Bartel v. Alco Steamship Co.* No. 15-3004 (5th Cir. Oct. 19, 2015) is relevant and binding authority supporting remand of Plaintiffs' claims. (R. Doc. 45).

On October 23, 2015, Defendant filed a response arguing that *Bartel* is distinguishable and irrelevant. (R. Doc. 53).

**III.    Law and Analysis**

The federal officer removal statute provides for the removal of a civil action against "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any

act under color of such office. . . ." 28 U.S.C. § 1442(a)(1).[6]  The purpose of this removal statute is to protect the lawful activities of the federal government from undue state interference. *See Mesa v. California*, 489 U.S. 121, 126 (1989).  Section 1442(a) serves to overcome the "well-pleaded complaint" rule that would otherwise preclude removal even if a federal defense is asserted.  *See id.* at 136.  Unlike the general removal provision, which is strictly construed in favor of remand, the federal officer removal statute is liberally construed in favor of removal. *Watson v. Philip Morris Cos. Inc.*, 551 U.S. 142, 147-48 (2007); *Willingham v. Morgan*, 395 U.S. 402, 406 (1969).

As characterized by the Fifth Circuit, a defendant seeking to remove a civil action under § 1442(a)(1) must establish the following three prongs: (1) that the defendant is a person within the meaning of the statute; (2) that the defendant acted pursuant to a federal officer's directions and that a causal nexus exists between the defendant's actions under color of federal office and the plaintiff's claims; and (3) that the defendant has asserted a "colorable federal defense." *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 397-01 (5th Cir. 1998), *cert. denied,* 526 U.S. 1034 (1999).  The party asserting federal jurisdiction in a case removed under § 1442 bears the burden of establishing that jurisdiction exists. *Winters*, 149 F.3d at 398.

Nothing in the Petition asserts a claim against the United States or any of the defendants in their capacity as government contractors working under the direction of federal officers. Nevertheless, because removal pursuant to Section 1442(a) may overcome the "well-pleaded

---

[6] DSM has not provided any arguments in support of removal pursuant to 28 U.S.C. § 1442(a)(2). Accordingly, "[i]n that the removing party bears the burden of establishing the propriety of removal, the Court will treat DSM's lack of briefing and proof with regard to subparagraph (a)(2) as an abandonment of that claimed basis for removal." *See Lalonde*, 1998 WL 34301466, at *1 n. 1.  Furthermore, because Plaintiffs' action does not affect the "validity of any law of the United States," removal is improper pursuant to 28 U.S.C. § 1442(a)(2). *See Faulk v. Owens-Corning Fiberglass Corp.*, 48 F. Supp. 2d 653, 670 (E.D. Tex. 1999).  Accordingly, the court will focus its analysis of the federal officer removal statute on Section 1442(a)(1).

complaint" rule, the court must determine whether DSM has met its burden of establishing that removal is proper pursuant to the federal officer removal statute.

## A.    The "Person" Requirement

To meet the first element, DSM must be a "person" for the purpose of § 1442(a)(1).  The Fifth Circuit has held that corporations are considered "persons" for removal pursuant to § 1442. *Winters*, 149 F.3d at 398.  Accordingly, the first element is satisfied.

## B.    The "Acting Under" and "Causal Nexus" Requirements

To meet the second element, DSM must establish that (a) it was "acting under" a federal officer's directions and (b) that there is a causal nexus between its actions under color of federal office and Plaintiffs' claims.  *Id*.   The court will address these subparts of the second element in turn.[7]

### 1.    The "Acting Under" Requirement

The Supreme Court has made it clear that the words "acting under" are broad and are to be liberally construed, though their interpretation must be limited by the statute's "language, context, history, and purposes." *Watson*, 551 U.S. at 147.  "A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.'" *Id*. at 153.  A private entity is acting under the direction of a federal officer where it "fulfilled the terms of a contractual agreement by

---

[7] In *Winters*, the Fifth Circuit combined and considered together the "acting under" and "causal nexus" prongs. *Winters*, 149 F.3d at 398.  Several decisions in the Fifth Circuit recognize this conflation of the two elements. *See, e.g.*, *Faulk*, 48 F. Supp. 2d at 669 n. 7.  The United States Supreme Court has, however, considered the "acting under" prong in isolation without reaching the "causal nexus" prong. *See Watson*, 551 U.S. 142 (cigarette manufacturers were not "acting under" direction of federal officer in light of federal laws, rules, and regulations governing labeling requirements on cigarettes); *see also Wilde v. Huntington Ingalls, Inc*., 616 Fed. App'x. 710, 713 (5th Cir. 2015) (concluding that the "acting under" sub-part was satisfied, but the "causal nexus" requirement was not satisfied).  Considering the specific facts of this case, the court finds it appropriate to discuss the "acting under" and "causal nexus" prongs separately.

providing the Government with a product that it used to help conduct a war" and arguably "performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Id*. at 153-54 (citing *Winters*, 149 F.3d 387).  The Fifth Circuit has recently concluded, in the context of denying a stay of a remand order, that the "acting under" test was satisfied where a contractor allegedly exposed a worker to asbestos in the process of "producing ships pursuant to the direction of the United States Maritime Commission," and presumably "the federal government would have had to build those ships had [the private contractor] not done so." *Wilde v. Huntington Ingalls, Inc*., 616 Fed. App'x. 710, 713 (5th Cir. 2015).[8]

Here, DSM owned and operated the Facility while Decedent was allegedly exposed to asbestos.  At that time, DSM's ownership and operation of the Facility was subject to National Security Clauses by which the federal government required DSM to conduct its operations in a manner consistent with the operating procedures and practices in place when the plants comprising the Facility were owned and operated by the United States for war efforts.  For purposes of national security, the federal government could require DSM to resume, with only 180 days' notice, the production of government-specified synthetic rubber in government-specified production amounts.  Congress required that all acts of sale contain and be expressly contingent upon a National Security Clause. *See* 50 App. U.S.C. § 1941e(h).  Without this contractual provision in place, the federal government would have to maintain its own plants for the purpose of national security readiness.  There is also evidence that the federal government conducted inspections to ensure that DSM satisfied the requirements of the National Security

---

[8] The Fifth Circuit went on to state that there was evidence in the record that the federal government directed that asbestos be used in the manufacturing of the ships. *Wilde*, 616 Fed. App'x. at 714.  It is unclear, however, whether the direction to use asbestos on the ships at issue was a necessary condition for the conclusion that the removing defendant was "acting under" the direction of a federal officer.

Clause.  Accordingly, it appears that based on the National Security Clauses in the sale contacts, DSM was acting under the direction of federal officers for the purpose of 1442(a)(1).

### 2.    The "Causal Nexus" Requirement

#### i.    The *Winters* and *Lalonde* decisions

The Fifth Circuit has recently characterized the "the key" to the causal nexus requirement in a chemical exposure case to be "whether the government had specified the standards and supervised the production of the toxic compound that the plaintiff claimed she was exposed to." *See Wilde*, 616 Fed. App'x. at 713 (citing *Winters*, 148 F.3d at 399-400).  In *Winters*, which concerned a strict liability claim against an Agent Orange producer, the Fifth Circuit focused on the federal government's detailed specifications regarding the chemicals at issue in concluding that the "causal nexus" requirement was satisfied:

> The gist of this action centers around the trace elements of dioxin contained in Agent Orange and whether a causal relationship exists between Winters's terminal disease and her alleged exposure to that dioxin. We are convinced that the government's detailed specifications concerning the make-up, packaging, and delivery of Agent Orange, the compulsion to provide the product to the government's specifications, and the on-going supervision the government exercised over the formulation, packaging, and delivery of Agent Orange is all quite sufficient to demonstrate that the defendants acted pursuant to federal direction and that a direct causal nexus exists between the defendants' actions taken under color of federal office and Winters's claims. The defendants have demonstrated the second criteria necessary for federal officers removal.

*Winters*, 148 F.3d at 399-400.

DSM argues that the "causal connection" requirement does not require that the alleged wrongful act or omission itself be specifically directed or compelled by federal duty or law. (R. Doc. 24 at 13).  To support this position, DSM relies on decisions by this court providing that the casual nexus requirement was satisfied where the decedents were exposed to silica dust or asbestos while working at the Facility while it was still government owned. *See Lalonde v. Delta*

*Field Erection, et al.*, No. 96-3244, 1998 WL 34301466  (M.D. La Aug. 5, 1998) (silica dust);

*Catania*, *et al. v. ACandS, Inc.*, *et al.*, No. 02-368 (M.D. La. June 14, 2002), *report and*

*recommendation adopted*, (M.D. La July 18, 2002) (asbestos).  In finding a "causal nexus" in the

*Lalonde* action, this court focused on the fact the Facility was government-owned and run

pursuant to the Operating Agreement between DSM and the United States:

> In the instant case, from 1943 through 1955, DSM operated the government-owned synthetic rubber plant for the federal government, pursuant to the Operating Agreement entered into between DSM and the federal instrumentality involved. The statement that DSM's federal duty *was* the operation of the synthetic rubber plant—in all of its facets and with all that that undertaking necessarily entailed—is not at all an oversimplification or overgeneralization. Rather, it is an entirely accurate statement of an essential material fact. It is what DSM contractually bound itself to do, as an agent of the federal government. Against this backdrop, it is clear that the requisite "causal connection" exists between the state court suit and DSM's discharge of its federal duties. Mr. Lalonde was sandblasting in order to maintain and refurbish plant equipment for continued use. <u>The question is not whether a specific federal law or order directed DSM not to warn Lalonde about the hazards of silica exposure (or even to maintain the plant equipment), but rather the question is whether that alleged failure to warn occurred while DSM was in the performance of its federal duties, *i.e.,* in the course of its operation of the plant as an agent for the federal government</u>. The Court therefore holds that the requisite causal connection is satisfied here. To the extent that some lower district court cases would hold to the contrary, the Court specifically rejects the analytical underpinnings of those cases.

*Lalonde*, 1998 WL 34301466, at *4 (emphasis added); *see also Catania*, No. 02-368, at *3-4

(relying on the Dennis and Samuels Affidavits in concluding that the causal nexus was satisfied

where the alleged exposure occurred during government ownership of the Facility and DSM's

subsequent ownership of the Facility).

 In this case, Decedent did not begin working at the Facility until 1956, after the United

States had sold the plant to DSM and the Operating Agreement was no longer in effect. (R. Doc.

9-6 at 1).  Accordingly, a key factual underpinning of the *Lalonde* and *Catania* decisions is not present in the instant matter.[9]

Furthermore, *Lalonde* was decided prior to the Fifth Circuit's issuance of the *Winters* decision a few days later.  In *Winters*, the Fifth Circuit provided that the question in determining whether the "causal nexus" requirement is satisfied is determined by "whether the government specified" the composition of the chemical compound at issue. *Winters*, 149 F.3d at 398.  In comparison, *Lalonde* states that a "causal nexus" can be established where "the defendant committed the alleged act or omission while performing its federal duties" regardless of whether the defendant can make "a showing in a civil case that the alleged wrongful act or omission itself was specifically directed or compelled by federal duty or law." *Lalonde*, 1998 WL 34301466, at *4.  The U.S. District Court for the Eastern District of Louisiana has consistently rejected this aspect of the *Lalonde* decision. *See Savoie v. Pennsylvania Gen. Ins.*, No. 15-1220, 2015 WL 3604848, at *5 (E.D. La. June 8, 2015), *appeal filed* (June 12, 2015); *Wilde v. Huntington Ingalls Inc.*, No. 15-1486, 2015 WL 2452350, at *2 (E.D. La. May 21, 2015), *appeal dismissed* (July 14, 2015); *Ross v. Reilly Benton, Inc.,* No. 14-1161, 2014 WL 3514668, at *2 (E.D. La. July 15, 2014); *Cole v. Northrop Grumman Ship Sys., Inc.*, No. 07-3049, 2008 WL 2651428, at *5 (E.D. La. July 7, 2008); *Joseph v. Fluor Corp.,* 513 F. Supp. 2d 664, 671-72 and n. 9 (E.D. La. 2007); *Sheppard v. Northrop Grumman Sys. Corp.*, No. 07-2208, 2007 WL 1550992, at *3 (E.D. La.

---

[9] The *Catania* decision specifically states that in that case, "[t]he alleged exposure occurred during periods when the facility was owned by the United States Government but operated by DSM Copolymer under the authority and direction of federal officers acting in their official capacities to direct the construction and operation of the plant, as well as during periods of ownership by DSM Copolymer *but under continuing government control*." *Catania*, No. 02-368, at *2 (emphasis added).  The decision provides no further analysis in support of the conclusion that DSM was "under continuing government control" after it purchased the Facility. Having reviewed the *Catania* decision in its entirety, the court concludes that its result hinges upon the allegation that at least part of the underlying exposure occurred during the period when the Facility was government owned.

May 24, 2007); *Bradley v. Northrop Grumman Sys. Corp.,* No. 071422, 2007 WL 1115246, at n. 3 (E.D. La. Apr. 12, 2007); *Hampton v. Owens–Illinois,* No. 06–10929, 2007 WL 274794, at *2 & n. 12 (E.D. La. Jan. 29, 2007); *Mouton v. Flexitallic, Inc.*, No. 99-0162, 1999 WL 225438, at *3 (E.D. La. Apr. 14, 1999).

Judges in this district have issued conflicting decisions that either criticize or follow the rationale in *Lalonde*.  The district judge in the instant matter distinguished *Lalonde*'s holding that the "causal nexus" requirement in the failure to warn context does not require direct federal government control over the contractor's activities with respect to warnings because it conflicts with the Supreme Court's recognition of the government contractor defense in *Boyle v. United Techs. Corp*., 487 U.S. 500 (1988). *See McFarlain v. Northrop Grumman Systems*, No. 05-1406, at *7-10 (M.D. La. Feb. 7, 2006).  In contrast, just one week earlier, another district judge followed the rationale in *Lalonde* (without specifically referencing *Lalonde*) in holding that, in the context of deciding a failure to warn case, there is "no basis in the language of Section 1442 or in controlling authority for the requirement that a defendant in a civil case show that the alleged wrongful act or omission was specifically directed or compelled by federal duty or law." *See Daniel W. Melford, Sr. v. Peter Territo, et al.*, No. 05-1405 (M.D. La. Jan. 31, 2006).[10]

The Fifth Circuit's *Bartel* decision briefly touches upon *Lalonde* and harmonizes its conclusion with *Winters*.  The Fifth Circuit focused on the following aspects of the *Lalonde* decision:

> *The federal government imposed* numerous safety requirements at the facility, such as the wearing of protective equipment. *The United States required* that safety meetings be held in each department on a monthly basis, and, in addition, required plant-wide safety meetings be held on a monthly basis. *The government dictated* the topics of these meetings. In summary, [the defendant] operated a

---

[10] In *McFarlain*, the district judge specifically recognized that his decision was at odds with *Melford*, *Lalonde*, and *Catania*. *McFarlain*. No. 05-406, at *10 n.5.

federal government-owned facility, exclusively for the government, *under the oversight and ultimate control of officers of the federal government.*

*Bartel*, 2015 WL 6211656, at *3 (quoting *Lalonde*, 1998 WL 34301466, at *3) (emphasis added by Fifth Circuit).  In short, the Fifth Circuit concluded that "[i]f there were any failure to warn in *Lalonde*, the failure was caused by the government's instructions." *See Bartel*, 2015 WL 6211656 at *6.  Nowhere in its decision does the Fifth Circuit address the broad announcement in *Lalonde* that for a causal nexus to exist, it does not matter "whether a specific federal law or order" directed the removing defendant "not to warn" the plaintiff regarding the compound at issue, but rather whether the removing defendant was performing "federal duties" when the alleged failure to warn occurred. *See Lalonde*, 1998 WL 34301466, at *5-6.

Based on the foregoing, the court finds that *Lalonde*'s pronouncement that the "causal nexus" prong only requires "a showing that the defendant committed the alleged act or omission while performing its federal duties" to be an overstatement of the law and unnecessary for the ultimate conclusion in the *Lalonde* decision.  The court will consider the jurisprudence in the Fifth Circuit as a whole to determine whether DSM has met its burden of establishing a causal nexus regarding either (i) Plaintiffs' "failure to warn" claims or (ii) Plaintiffs' premises liability claims.[11]

### ii.      Plaintiffs' Failure to Warn Claims

In the wake of *Winters*, this court has held that to satisfy the "causal nexus" requirement in the "failure to warn" context, at a minimum, the removing defendant must show "that the government provide some level of direct control over warnings."  *McFarlain*, No. 05-1406, at *3 (causal nexus prong not met where removing defendant "has presented no evidence that the

---

[11] DSM does not argue that Plaintiffs' intentional tort claims are removable on the basis of the federal officer removal statute.

government exercised any control over activities related to warnings" of asbestos); *but see Melford*, No. 05-1405 (causal nexus prong met even where there was no evidence that the government specifically controlled activities related to warnings of asbestos).  The district judge in the instant matter has more recently held that a causal connection was satisfied in a plaintiff's failure to warn claim where the plaintiff was allegedly exposed "to brakes, heat shields, insulation and material and other components containing asbestos which were used in various aircrafts built by the Airplane Defendants while serving as a pilot and instructor with the United States Air Force in 1956" and the removing defendants demonstrated "that manuals, written materials, warnings and markings on the airplanes were specified, and their design and construction was controlled, by the government." *See Leonard v. Bd. of Supervisors of Louisiana State Univ. & Agr. & Mech. Coll.*, No. 13-565-JJB-SCR, 2014 WL 2197042, at *1, 3 (M.D. La. Jan. 17, 2014) *report and recommendation adopted sub nom. Leonard v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.*, 2014 WL 2203876 (May 27, 2014); *see also Bartel v. Alcoa Steamship Co.*, 64 F. Supp. 3d 843, 854-56 (M.D. La. 2014) (analogizing various product liability decisions concerning the design and marketing of airplanes and ships to Jones Act claim removed pursuant to the federal officer statute), *affirmed*, 2015 WL 6211656 (5th Cir. Oct. 19, 2015)

    The court finds the evidentiary standards provided in *McFarlain* and *Leonard*, both of which were decided by the district judge in this case, to be controlling.  Under those standards, to establish a causal connection regarding Plaintiffs' failure-to-warn negligence claims, DSM must present some evidence that the federal government restricted its ability to warn about asbestos exposure.

Here, DSM argues that the Baker, Samuels and Dennis affidavits demonstrate that the United States maintained control over safety issues at the Facility through 1965. (R. Doc. 24 at 13). While the Baker Affidavit provides insight into United States' control over the Facility when it was government-owned, it does not provide information regarding the Facility after it was purchased by DSM because Mr. Baker was employed by DSM only from 1950 to 1952. (R. Doc. 24-4). Similarly, although Mr. Samuels was employed by DSM from 1943 to 1982, the Samuel Affidavit only provides information about safety procedures during the period of government ownership of the Facility. (R. Doc. 24-5).

The only affidavit relied upon by DSM touching upon the relevant period is the Dennis Affidavit. (R. Doc. 24-6). Mr. Dennis states that during the 1950s and 1960s, he did not have any reason to believe that asbestos containing insulation presented a health hazard to employees working at the plant. (R. Doc. 24-6 at 3). Mr. Dennis' own testimony shows that even as a chemical engineer, he was not informed by DSM of the health risks posed by asbestos.

There is no information in the foregoing affidavits supporting the proposition that the United States was responsible for safety measures at the Facility during the decedent's employment. As pointed out by Plaintiffs, the Acts of Sale provided that DSM, not the United States, was charged with maintaining the facilities "free from waste or nuisance of any kind, and in good repair, working order, and condition" and with making "all needful and proper repairs thereto and renewals and replacements thereof." (R. Doc. 9-4 at 18; R. Doc. 9-5 at 21-22). DSM has not provided any documents showing the federal governments' post-sale control over safety standards or warnings in relation to asbestos. In the absence of such evidence, DSM fails to meet the causal nexus required in relation to Plaintiffs' failure to warn claim.

This conclusion is consistent with various "failure to warn" decisions issued by other district courts in the Fifth Circuit. *See*, *e.g.*, *Savoie*, 2015 WL 3604848, at *5 (remanding action where defendant failed to present evidence that the federal government restricted their ability to warn employees of their exposure to asbestos and related damages); *Wilde*, 2015 WL 2452350, at *5 ("[T]he defendant must show that they acted pursuant to a federal officer's directions when committing the acts that allegedly gave rise to the injury at issue to satisfy the causal nexus prong of the *Mesa* elements."); *Francis v. Union Carbide Corp.*, No. 11–2695, 2011 WL 6180061, at *3 (E.D. La. Dec. 13, 2011) ("For a Defendant to remove a failure to warn case based on federal officer jurisdiction, the government, at a minimum, must have provided some level of direct control over warnings."); *Hampton*, 2007 WL 274794 (remanding action removed pursuant to § 1442(a)(1) where the removing defendant did not identify any evidence that shipyard where the plaintiff worked as a welder "was barred from instituting enhanced safety and warning procedures regarding asbestos"); *Faulk*, 48 F. Supp. 2d at 664 (although removing defendants established that there are "detailed, government specifications" relating to the products it manufactured, no federal officer provided any direction regarding providing warnings about asbestos); *Mouton*, 1999 WL 225438 ("The federal government provided no direction on warnings when using asbestos, and further did not prevent Avondale from taking its own safety precautions above the minimum standards incorporated in the federal contracts. Thus, the Court finds that Avondale has failed to establish a causal connection between the Navy's direction pursuant to the design contracts and plaintiff's failure to warn claims.").

In conclusion, DSM has failed to meet its burden of establishing a causal connection between its direction under a federal officer and the injuries alleged by Plaintiffs. The court will,

therefore, turn to whether Plaintiffs' premises liability claims provides an avenue for removal

pursuant to the federal officer removal statute.

### iii.    Plaintiffs' Premises Liability Claims

In addition to their failure to warn claims, Plaintiffs alleges in Count Seven of their

Petition that DSM is subject to premises liability based on the following allegations:

> (1) "Decedent was exposed to asbestos and asbestos-containing materials while working" at the Facility;

> (2) DSM was, at all relevant times, the operator, manager, owner, and/or occupier of the Facility and in custody of the Facility;

> (3) The Facility was "defective in that the asbestos and asbestos-containing materials" in the Facility "created an unreasonable risk of harm to Decedent and other persons on the premises";

> (4) The "defective condition of the facilities was a proximate cause of Decedent's asbestos-related injuries and damages";

> (5) DSM failed to exercise reasonable care to protect Decedent from the foreseeable damages associated with exposure to asbestos;

> (6) DSM "had a non-delegable duty to keep the premises safe for invitees";

> (7) DSM "knew or should have known of the unreasonable risk of harm inherent in exposure to asbestos and asbestos-containing materials but failed to protect Decedent from said risk of harm";

> (7) DSM's "failure to protect Decedent from known and/or foreseeable damages constitutes negligence"; and

> (8) "Said negligence was a proximate cause of Decedent asbestos-related injuries and damages."

(Petition, ¶¶ 57-58). Other than stating that it is brought under the theory of negligence,

Plaintiffs do not specifically cite a source of Louisiana law in support of their premises liability

claim. Plaintiffs specifically exclude DSM from Count Four of their Petition, which alleges a

strict liability claim against certain "Contractor Defendants" pursuant to Louisiana Civil Code

article 2317. (Petition, ¶ 45).  Plaintiffs argue that because their premises liability claim is based upon the reasonableness of DSM's "manner of use" of the asbestos as opposed to its mere "possession" of such asbestos, it is based on a theory of negligence as opposed to strict liability. (R. Doc. 9-1 at 18).  At oral argument, Plaintiffs' counsel further represented that Plaintiff had not alleged a strict liability claim against DSM and was proceeding under a theory of negligence in support of its premises liability claim.

Having reviewed the allegations in Count Seven of the Petition, the court concludes that Plaintiff has alleged a premises liability claim against DSM based in negligence, presumably pursuant to Louisiana Civil Code articles 2315, 2316, and/or 2317.1.  There is no indication in the Petition that Plaintiff has alleged a strict liability claim against DSM.[12]  Regardless of whether Plaintiff's premises liability claims are characterized as negligence or strict liability claims, however, the court concludes that DSM has failed to demonstrate a casual nexus with regard to its acts pursuant to a federal officer and Plaintiffs' premises liability claims.[13]

---

[12] Despite denouncing that they have brought any strict liability claims against DSM, Plaintiffs assert that they have brought their premises liability claim pursuant to Louisiana Civil Code article 2317 as it is read prior to 1996.  Such a claim would sound in strict liability, not negligence. *See Dupree v. City of New Orleans*, 765 So. 2d 1002, 1007-08 (La. 2000) ("In an action asserting liability under La. Civ. Code art. 2317 before 1996, the plaintiff bore the burden of proving three elements: (1) that the thing which caused the damages was in the care, custody, and control (garde) of the defendant; (2) that the thing had a vice, ruin, or defect that presented an unreasonable risk of harm; and (3) that the vice, ruin, or defect was the cause-in-fact of the plaintiff's damages").  The addition of article 2317.1 in 1996 modified article 2317 by removing strict liability and adding requirements of foreseeability and reasonable care. *See Dupree*, 765 So. 2d at 1007 n. 5; *see also Johnson v. Transwood, Inc.*, No. 14-102, 2015 WL 5634584, at *6 n. 45 (M.D. La. Sept. 24, 2015) ("Article 2317.1 modifies Article 2317 by removing strict liability).  As Plaintiff alleges the negligence-based elements of foreseeability and reasonable care in connection with its premises liability claim against DSM, the court finds that the premises liability claim sounds in negligence.

[13] The Eastern District of Louisiana has recently held that where a plaintiff's premises claim is based upon the removing defendant's failure to properly handle asbestos in its custody, as opposed to the mere use of asbestos in its custody, the claim is based in negligence. *See*, *e.g.*, *Savoie*, 2015 WL 3604848, at *7; *Wilde*, 2015 WL 2452350, at *7; *Grainer v. Northrop Grumman Ship Sys., Inc.*, No. 06-3738, 2008 WL 5216213, at *1 (E.D. La. Dec. 12, 2008).  By characterizing the premises liability claims as "negligence" claims, the Eastern District of Louisiana has required the removing defendant to show not only that the government required the use of asbestos on the premises to establish the "causal nexus" requirement, but

This court has previously considered whether removal was proper based upon "premises liability" claims by which the plaintiff alleged exposure to asbestos in the custody of the removing defendant.  This court has consistently required a showing of specific requirements by the federal officer for the use of asbestos, as well as inspections ensuring the use of asbestos, on the removing defendant's property for the "causal nexus" requirement to be satisfied on such a claim. *See Legendre*, 2012 WL 2064533 (finding "causal nexus" for premises liability claim where the record showed that the ships Plaintiff worked on at the removing defendant's premises "were constructed under contracts that incorporated by reference federal law, regulations and specifications which mandated the use of asbestos-containing materials in the construction of the vessels" and that "during all aspects of the construction of the ships, officials of the U.S. Navy, Maritime Commission and U.S. Coast Guard closely and continuously monitored and inspected [the removing defendant's] work to ensure compliance with the contractual and federal regulatory provisions, including those that required the use of asbestos-containing materials."); *Kluka v. Anco Insulations, Inc.*, No. 08-84, 2008 WL 2444517 (M.D. La. Apr. 28, 2008) (same); *McFarlain*, No. 05-1406, at *11 (removing defendant provided "considerable evidence" of pervasive government control over requirements that it "use asbestos-containing materials"). Based on the federal government's requirement that asbestos be used in ship construction, and the existence of such asbestos on the removing defendant's premises, the *Legendre*, *Kluka*, and

---

also that the government required the asbestos to be used in the manner in which it harmed the plaintiffs and/or decedents.  *See, e.g.*, *Savoie*, 2015 WL 3604848, at *7 ("Because Defendants have failed to show how the U.S. Navy's or the U.S. Coast Guard's direction and regulations during the construction of the vessels affected [the removing defendant's] ability to either warn its employees of their exposure to asbestos or handle the asbestos-containing materials, Defendants have failed to satisfy the causal nexus requirement.").

*McFarlain* decisions all concluded that the removing defendant established a "causal nexus" between the federal officer's directions and the plaintiffs' claims of exposure.[14]

DSM has not provided the court with any direct evidence that the United States directed or required it to maintain asbestos at the Facility.  Instead, DSM argues that (1) the United States required asbestos as part of the original design aspects of the Facility; and (2) the United States required DSM to maintain the asbestos in place, pursuant to the National Defense Clause, because it was necessary to achieve the correct heat levels for the manufacturing of the synthetic rubber.  DSM relies upon the Dennis Affidavit (R. Doc. 24-6) to support these claims.  Mr. Dennis, while employed at DSM, was a chemical engineer responsible for staying abreast of the current state of technology in use for the production, maintenance, and operation of the Styrene Butadiene Rubber manufacturing operations. (R. Doc. 24-6 at 1).  Mr. Dennis states that the original design and operation specifications, which were prepared at the direction of the United States, called for the use of asbestos-containing insulation in many locations throughout the plant. (R. Doc. 24-6 at 2).  While the Dennis Affidavit states that the United States designed the Facility, DSM has not provided the specific documents demonstrating that the United States required the use of asbestos.  Even assuming that the United States initially required the Facility to have asbestos, there is no evidence that DSM was ever precluded from removing the asbestos-containing materials once DSM took full ownership and control of the Facility.

The Dennis Affidavit provides that without asbestos-containing insulation, it would have been impossible to maintain the process steam temperatures that were essential for the production of butadiene and synthetic rubber. (R. Doc. 24-6).  Mr. Dennis states that to the best of his knowledge an asbestos free insulation was not available during the 1940s to the 1960s. (R.

---

[14] The *Legendre*, *Kluka*, and *McFarlain* claims all considered premises liability in the context of alleged strict liability claims.

Doc. 24-6 at 3).  While this may be true, there is no documentation or contract demonstrating that the United States was in control of the use of asbestos-containing materials.  The Act of Sale gave DSM the responsibility to "sell or otherwise dispose of in regular course of operation of the Facility any of the machinery, equipment or other property. . . [which] has become worn out, obsolete or otherwise unfit for use." (R. Doc. 9-4 at 21).  Since DSM, and not the United States, was responsible for maintaining and updating the Facility, the decision to maintain asbestos at the Facility fell on DSM.

In the *Legendre*, *Kluka*, and *McFarlain* decisions, this court found sufficient evidence was submitted to conclude that premises liability claims brought by the respective plaintiffs were causally connected to the removing defendants' actions under federal officers.  In *Legendre*, the removing defendants relied on deposition testimony and affidavits to show that the ships that the plaintiff worked on at Avondale were constructed under contracts that incorporated by reference federal law, regulations and specifications which mandated the use of asbestos-containing materials in the construction of the vessels. *Legendre*, 2012 WL 2064533.  During all aspects of the construction of the ships, officials of the U.S. Navy, Maritime Commission and U.S. Coast Guard closely and continuously monitored and inspected Avondale's work to ensure compliance with the contractual and federal regulatory provisions, including those that required the use of asbestos-containing materials. *Id*.  In *Kluka*, the defendants produced a contract providing that the plans and specifications for ship construction were to be reviewed and enforced by the U.S. Navy and U.S. Maritime Administration, and that by federal law in the contract, the United States required the use of asbestos-containing materials in the construction of the vessels. *Kluka*, 2008 WL 2444517.  Similarly, in *McFarlain*, the court stated that the analysis of a premises liability claim was fairly straightforward due to the contract specifications provided in support of

affidavits that the government exercised pervasive control and that the government required the use of asbestos-containing materials. *McFarlain*, No. 05-1406, at *11.

Here, DSM was not producing a product for government use.  At most, it was subject to a condition that could allow the United States to take control over its production of synthetic rubber or butadiene as needed for national security.  DSM has failed to provide any evidence or documentation that showed that the United States required DSM to use asbestos-containing material during the time of Decedent's employment.  DSM has only provided the court with an affidavit stating that asbestos was required in the initial government specifications.  DSM has not provided those actual specifications.  Most importantly, DSM has failed to provide any contract or document under which the United States specifically required the use of asbestos at the Facility after it was sold to DSM.  Accordingly, the court finds the conclusions reached in the *Legendre*, *Kluka*, and *McFarlain* to be distinguishable from the case at hand.

Based on the foregoing, DSM has also failed to satisfy the "causal nexus" requirement for Plaintiffs' premises liability claims.

### C.    Whether DSM Has Asserted a Colorable Federal Defense

"The third and final factor necessary for removal pursuant to § 1442 is the assertion of a 'colorable federal defense.'" *Winters*, 149 F.3d at 400 (quoting *Willingham,* 395 U.S. at 406–07). The defendant "need not prove the asserted defense, but need only articulate its 'colorable' applicability to the plaintiff's claims." *Id*.  In this case, DSM has raised the government contractor defense and other defenses and immunities available under the Defense Protection Act of 1950, 50 U.S.C §2061, *et seq*., and its statutory predecessor, *e.g*., the Second War Powers Act, Ch. 199 Stat. 176 (1942). (R. Doc. 1 at ¶ 11).

27

Under the government contractor defense, "liability cannot be imposed upon government contractors for design defects in military equipment when '(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.'" *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 207 n. 5 (5th Cir. 2010) (quoting *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512, (1988)).  DSM provides no argument regarding whether it can raise this defense regarding acts or omissions that occurred when it was not producing "military equipment" pursuant to a government contract.  Moreover, as discussed above, DSM has not provided any "precise specifications" approved by the United States regarding the use of asbestos, much less how any asbestos used by DSM conformed to those specifications.

Section 707 of the Defense Production Act, 50 U.S.C. App. § 2061 *et seq*., immunized contractors who were forced under threat of criminal sanction to perform contracts for the Defense Department from certain liabilities stemming from the performance of those contracts. The Defense Production Act states, in relevant part: "No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this Act. . . ." 50 U.S.C. App. § 2157.  DSM has not directed the court to any "rule, regulation, or order issued pursuant to [the] Act" compliance with which has exposed them to liability.

At most, DSM has identified two federal defenses that other courts have found to be "colorable" in other cases.  DSM provides no argument, however, regarding why they are entitled to raise these defenses, regardless of whether they will prevail on them or not.  The mere assertion of federal defenses found to be "colorable" in other removals is insufficient under the

federal officer removal statute to satisfy this prong. *See Ross*, 2014 WL 3514668 (found that defendant failed to analyze the requirements of the defense or state what facts in the case made a colorable basis for the application of the defense).

Based on the foregoing, the court concludes that DSM has failed to establish that it has a colorable federal defense in support of removal pursuant to 28 U.S.C. § 1442(a)(1).  Even if DSM established this element, it has failed to establish a causal nexus exists between DSM's actions under color of federal office and the Plaintiffs' claims.

**IV.     Conclusion**

DSM has failed to establish that this court has removal jurisdiction pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a). The court does not have jurisdiction over this action and finds removal to be improper.

It is the **RECOMMENDATION** of the magistrate judge that Plaintiffs' Motion to Remand (R. Doc. 9) should be **GRANTED**, and the action should be **REMANDED** to the 19th Judicial District Court, East Baton Rouge Parish, Louisiana.

Signed in Baton Rouge, Louisiana, on November 23, 2015.


**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**

29